Clay C. PRINCE, Appellant,

v.

PARACHUTES, INC., Appellee.

No. 7804.

Supreme Court of Alaska.

June 8, 1984.

John Suddock, Robert M. Libbey, Libbey, Suddock & Hart, Anchorage, for appellant.

Richard A. Helm, Burr, Pease & Kurtz, Inc., Anchorage, Richard D. Hart, Condon & Forsyth, Los Angeles, Cal., for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

In this products liability case, Clay Prince seeks to recover from a manufacturer of parachutes, Parachutes, Inc., for personal injuries resulting from a parachuting

accident. He alleges that the manufacturer failed to adequately warn of the difficulty of managing its parachute. Prince appeals from an order granting summary judgment for the manufacturer.

## I. *Facts*

In the spring of 1979 Prince decided to learn how to parachute. He attended two classes where he learned the basics of parachuting and where he learned to jump using the standard military round canopy parachute. During the summer, he made 29 jumps using the military round canopy.

After jumping one day, Prince was offered the use of a parachute with a triangular canopy by a Mr. Roman; this parachute is called the Paradactyl. Roman told Prince that he was ready for the Paradactyl and Roman briefed him on some of the flying characteristics of the Paradactyl.

When he borrowed the Paradactyl, Prince was already aware that there were variations in parachutes (such as the square parachute that had to be operated compared to the round parachute that simply dropped). He was also aware that once one jumped using the military round canopy fifty times, one would advance to the parachute called the "Paracommander."

Before using the Paradactyl, Prince was twice told that he should get the permission of Mickey Sleeper, a U.S. Parachute Association (USPA) Area Safety Officer, because the parachute was more advanced than what Prince was used to and because he "probably wouldn't be allowed to jump it on [his] own...." Prince did consult with Sleeper regarding his use of the Paradactyl and did get her permission. Such permission is required by USPA regulation of canopy progression by novices.

Prior to the accident, Prince jumped using the Paradactyl a total of five times. On August 12, 1979, Prince made four of the five jumps using the Paradactyl. During each jump he had problems landing the parachute properly. He would tumble and roll on the ground; one time he hurt his knees but experienced no bleeding or bruises. He asked various people, including Sleeper, what he was doing wrong, but "nobody seemed to know because nobody had jumped the Paradactyl. Their suggestions were to 'keep experimenting.'"

On August 19, Prince made two jumps, both with the Paradactyl. This time he jumped with three other parachutists. The three others included Sleeper, Suzy Neuman and another person, Doug, who were all experienced sky divers and who were all using square canopies. The first jump that day was unremarkable except for the landing. It was on the second jump that the accident occurred. At first, the jump was going fine; Prince had no real problem leaving the plane and the parachute opened without difficulty. While in the air, Prince observed that Sleeper and Doug had landed. Prince saw that Neuman was far off to his left (less than a mile), and although she was at a lower altitude, he decided to land next because he was closer to the target.

When he was about 300–500 feet above the ground he took one last look at Neuman before cutting into the wind and descending. At 50 feet he started slowing down and was preparing to land. He had lost sight of Neuman because his back was to her. He states that he "wasn't even thinking about her at that point. [He] was concentrating on landing." Out of the corner of his eye, he saw Neuman's canopy coming right at him, and he did not have time to react. The canopy hit him between the shoulder and hip. His canopy lost its air and he fell 30 feet. Prince broke his neck and is now a quadriplegic.

In his deposition, Prince admits that (1) he knew the speed of the Paradactyl but did not know the speed of the square canopy; (2) he should not have landed before Neuman because the low person has the right to land first; (3) the parachute performed fine; (4) the speed of the parachute was not a problem until he attempted to land; and (5) he was where he wanted to be (over the target area) before the collision.

In an affidavit, he states that the Paradactyl was so difficult for him to land that

it required all of his attention to the extent that he became unaware of Neuman's placement, and that this would not have occurred if he had not used the Paradactyl.

He further indicates in his affidavit that if there had been a warning sewn into the Paradactyl, or if he had been told to read a manual which contained an adequate warning and had learned that the parachute was too advanced for him, he would never have used it.

Sleeper, the area safety officer, admits that she was ignorant about the difficulty of managing the Paradactyl, and about the experience level required to safely use the Paradactyl. She had never used the Paradactyl, although she had observed it in the air. At the time Sleeper gave Prince permission to use the Paradactyl she considered him to be an average but not extraordinary parachute jumper for his experience level.

There is a manual for the Paradactyl. On page 2 of the manual under the heading "Interesting Facts about the Paradactyl" the manual states that "the Paradactyl is a high performance parachute and is recommended for use by experienced jumpers (over 100 jumps)." On page 4 of the manual there is a section titled "Flight Instructions and Characteristics" which contains various warnings about the Paradactyl, but in this portion of the manual there is no mention of the suggested experience level. There is no warning sewn into the parachute itself.

Gary Douris, one of Prince's expert witnesses, states that Prince never should have jumped the Paradactyl because it was too advanced for one of his experience. In his affidavit, Douris states that:

> As Clay Prince approached the landing zone, he should have rechecked his position relative to the Suzy Neuman canopy. He did not do so. I believe he was not able to do so because the demands upon him of landing the canopy were too great, given his prior unsuccessful landings and his lack of training, knowledge

and experience. If he had been under a canopy that was proper for his experience level, I believe the collision probably would not have occurred.

However, Douris also states that the warning in the manual was adequate and that it was not the standard of the industry to stamp warnings in the parachute itself. Another expert for Prince, MacCollum, states in his affidavit that:

> The manufacturer's brochure on the Paradactyl is grossly deficient when addressing inherent hazards which endanger the lives of all prospective users. Reasonable means are available to acquaint the user with dangers associated with use of this type of parachute. A fabric warning could have been sewn on the parachute to alert prospective users to the fact that the Paradactyl was not a parachute to be used by a novice jumper and directing prospective users to an accompanying manual which would describe in detail the pre-requisites for its use—the number of jumps and other qualifications which must be met before attempting to use the Paradactyl.

A complaint was filed on May 5, 1981 against Mickey Sleeper and the Para-Angels Sport Parachute Club. On August 18, 1981 the complaint was amended to add causes of action against Gene Sleeper, Neuman, and manufacturers of the Paradactyl, Parachutes, Inc. and FXC Corporation.[1] The causes of action against Parachutes, Inc. and FXC Corporation were for products liability. In a second amended complaint, Prince alleged more specifically that Parachutes, Inc. was liable in products liability for its failure to adequately warn of the expert experience level required of parachutists who use the Paradactyl.

Parachutes, Inc. filed a motion for summary judgment in which it argued (1) that the Paradactyl was not defective because of an insufficient warning since the manual provided an adequate warning, and since Prince was already aware of any potential

---

1. Causes of action against FXC were later dismissed due to the discovery that Parachutes, Inc. had manufactured the Paradactyl used by Prince.

hazard presented by using the Paradactyl (as he had jumped the Paradactyl five times) and (2) that Prince's use of the Paradactyl was not a cause of the accident.

The trial judge granted summary judgment for Parachutes, Inc. In the order, the trial judge stated that:

> The Court concludes that defendant had no duty to warn plaintiff of the flight characteristics of the parachute in question, since plaintiff had actual knowledge of such characteristics from having made several jumps with the parachute. The Court also concludes that defendant is entitled to summary judgment on the issue of causation.

Prince appeals from that order.

## II. *Duty*

The first issue this court must address is whether Prince's knowledge of the flight characteristics of the parachute had any effect on Parachutes, Inc.'s duty to warn.

Prince argues that the trial judge's statement implies (1) that Parachutes, Inc. owed a duty to warn that the Paradactyl was inherently unsafe for novices and (2) that once one became familiar with the Paradactyl there was no longer a duty to warn. Prince asserts that the trial judge applied an incorrect analysis of the law. Prince argues: (1) that the subjective knowledge of the user is not relevant to establishing the fact that Parachutes, Inc. had a duty to warn parachutists of the experience level required before one used the Paradactyl; (2) that the subjective knowledge of Prince is only relevant to the defense of comparative negligence; (3) that the extent of Prince's comparative negligence, if any, is a question of fact; and (4) that the proximate cause for Prince's injury is a question of fact.

Prince asserts that no Alaska case addresses the issue of failure to warn in this context. However, Prince points out that other jurisdictions have applied objective criteria to the existence of duty in a failure to warn situation.

Parachutes, Inc. argues that "manufacturers are not liable in strict liability for failure to warn where the dangers associated with the use of the product are actually known to the users." Parachutes, Inc. asserts that Prince was well aware of the dangers involved in using the Paradactyl and of the difficulty he was having in landing the parachute.

A manufacturer is strictly liable in tort when he places an article on the market, knowing that it is to be used without inspection for defects, and the article proves to have a defect that causes injuries to a human being. *Clary v. Fifth Avenue Chrysler Center*, 454 P.2d 244, 247–248 (Alaska 1969). "[A] plaintiff satisfies his burden of proof when he proves the existence of a 'defect' and that such defect was a proximate cause of his injuries." *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 878 (Alaska 1979). In *Caterpillar Tractor*, we further recognized that, in addition to a product being defective because of a flawed construction or because it was improperly designed, a product may be defective because of "misinformation or inadequate information about risks involved in using the product or about minimizing or avoiding harm from such risks." *Id.* at 878, n. 15. In such a case, a product, although faultlessly manufactured and designed, can be defective when placed in the consumers' hands without first giving an adequate warning concerning the manner in which to safely use the product. *Teagle v. Fischer & Porter*, 89 Wash.2d 149, 570 P.2d 438, 442 (1977); Restatement (Second) of Torts § 402A, comments h & j (1965).

The focus in a strict liability case is on the condition of the product itself. *Caterpillar Tractor Co.*, 593 P.2d at 883. "The defendant is strictly liable due to the existence of a defective condition in the product." *Butaud v. Suburban Marine & Sport. Goods, Inc.*, 555 P.2d 42, 45 (Alaska 1976). The knowledge and acts of the victim are relevant to the defendant's defense: comparative negligence, assumption of the risk, or contributory negligence, depending upon the jurisdiction.

■■ A good statement of the duty to warn concept in the context of strict liability is contained in California Jury Instructions § 9.00.7:

> A product is defective if the use of the product in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer fails to give adequate warning of such danger.

Inherent in this statement is the limitation which we recognized in *Patricia R. v. Sullivan*, 631 P.2d 91, 102 (Alaska 1981) that there is no duty to warn of hazards or dangers that would be readily recognized by the ordinary user of the product. Implicit in the statement is also the concept that it is the knowledge of the ordinary user of the product which is relevant to the duty to warn rather than what the actual user in the case actually knew.

> It is not the knowledge actually possessed by the plaintiff, individually, that determines whether the absence of warning renders a product unreasonably dangerous. The subjective knowledge of the plaintiff becomes relevant upon the issue of contributory negligence, as we explain below. On the issue of duty to warn, however, the question to be put to the jury is whether "the danger, or potentially [sic] of danger, is generally known and recognized. . . . "

*Jackson v. Coast Paint and Lacquer Co.,* 499 F.2d 809, 812 (9th Cir.1974).

■■ Whether an ordinary parachutist would readily recognize that a Paradactyl should be used by experienced parachutists only is a question of fact on the record presented. The Paradactyl had only been marketed for a short period of time prior to the accident and the experience level required for its use was apparently unappreciated not only by Prince and Roman, but by the Area Safety Officer, Sleeper. Prince's subjective awareness of the difficulty of managing the Paradactyl should not be considered in determining whether the Paradactyl was defective due to a failure to warn.

As stated above, the victim's subjective knowledge is, however, relevant to defendant's defenses. In *Jackson,* the court stated that "the subjective knowledge of the plaintiff becomes relevant upon the issue of contributory negligence. . . ." 499 F.2d at 812.

In *Butaud v. Suburban Marine & Sport. Goods, Inc.,* 555 P.2d 42 (Alaska 1976), we held that the comparative negligence defense is applicable to strict liability cases. We stated that:

> In *Kaatz v. State,* we adopted the standard of comparative negligence, which will be applied in strict products liability cases. We feel that pure comparative negligence can provide a predicate of fairness to products liability cases in which the plaintiff and defendant contribute to the injury. The defendant is strictly liable due to the existence of a defective condition in the product. On the other hand, the plaintiff's liability attaches as a result of his conduct in using the product.

*Id.* at 45–46 (footnotes omitted). *See also Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 889 (Alaska 1979).

There are no cases in Alaska applying comparative negligence to a duty to warn case. However, such cases have arisen in Washington.

In *Teagle v. Fischer & Porter Co.,* 89 Wash.2d 149, 570 P.2d 438 (1977), the plaintiff was injured while using a flowrator to measure liquid chemical fertilizer. The defendant did not give an adequate warning of the dangers of measuring liquids above 50 p.s.i., or of using a particular ring sealer when measuring ammonia. In evaluating the adequacy of the warning, the plaintiff's actions were not considered. However, the court went on to decide the issue of the plaintiff's comparative negligence. The court stated that:

> Turning to the issue of the trial court's order setting aside the jury verdict on plaintiff's contributory negligence, we begin by noting that the Restatement

(Second) of Torts provides a general guideline for asserting contributory negligence as a defense in strict liability:

n. *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

Restatement (Second) of Torts § 420A [sic], comment n (1965). See Products Liability: Contributory Negligence or Assumption of Risk as Defense Under Doctrine of Strict Liability in Tort, Annot., 46 A.L.R.3d 240 (1972). *Although under comment n a plaintiff would be barred from any recovery if the trier of fact found the plaintiff had voluntarily and unreasonably proceeded to encounter a known danger, the adoption of comparative negligence in this jurisdiction, see RCW 4.22.010, renders the plaintiff's conduct a damage-reducing factor only.*

*Id.* at 443 [2] (emphasis added). *See also Martinez v. Atlas Bolt & Screw Co.,* 636 P.2d 1287, 1290 (Colo.1981).

**2.** In a later Washington case, *Seay v. Chrysler Corp.,* 93 Wash.2d 319, 609 P.2d 1382 (1980), the court held that mere negligence would not reduce plaintiff's award. It "did not rule out the admissibility of evidence of that 'form of contributory negligence' which 'commonly passes under the name of assumption of the risk' as an available damage-reducing factor." *Boeke v. International Paint Co. (Cal.), Inc.,* 27 Wash.App. 611, 620 P.2d 103, 105 (1980).

▆▆ We agree with the court in *Teagle* that a plaintiff's awareness of the risk is relevant to the issue of comparative negligence and not to the issue of duty to warn. We therefore hold that summary judgment in favor of Parachutes, Inc. on the basis that there was no duty to warn because Prince assumed the risk was improper.[3]

### III. *Causation*

The trial court also granted summary judgment for Parachutes, Inc. because it concluded that any failure to adequately warn was not a cause of Prince's injuries. No rationale was provided to support this conclusion.

▆▆ In a cause of action for strict liability, a plaintiff must prove that the product is defective and that the defect in the product was a proximate cause of plaintiff's injuries. *Caterpillar Tractor v. Beck,* 593 P.2d 871, 878 (Alaska 1979). "[I]t is not necessary that the plaintiff establish that the defect in the product was the sole proximate cause of injury." Paul Sherman, Products Liability § 7.17 (1981). The issue of proximate cause is normally one for the trier of fact, and becomes a matter of law only where reasonable minds could not differ. *Sharp v. Fairbanks North Star Borough,* 569 P.2d 178, 183–184 (Alaska 1977).

▆▆ We realize that there are multiple factors which may have contributed to the accident. However, we cannot as a matter of law hold that Parachutes, Inc.'s alleged failure to warn was not also a proximate cause of the accident. There is sufficient evidence in the record from which reasonable minds could conclude that Prince would not have used the Paradactyl had he

**3.** We note that before a jury can consider whether Prince was comparatively negligent in order to reduce Prince's award, the jury must *first* find that the Paradactyl was defective due to a failure to adequately warn *and* that this failure to warn was a proximate cause of his injuries.

been adequately warned about the experience level required to properly manage the Paradactyl and that he became inattentive to his surroundings and made misjudgments because he was overtasked by the overwhelming demands of landing the Paradactyl.

Because we find both grounds given by the trial court for summary judgment to be improper, we REVERSE and REMAND.